Present:  Carrico, C.J., Compton, Stephenson, Lacy, Hassell,
Keenan, JJ., and Whiting, Senior Justice

VIRGINIA DEPARTMENT OF TAXATION

OPINION BY
v.    Record No. 941729          SENIOR JUSTICE HENRY H. WHITING

November 3, 1995

MAURIE L. DAUGHTRY

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Randolph T. West, Judge

VIRGINIA DEPARTMENT OF CORRECTIONS

v.    Record No. 941955

JAMES DILLON

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Charles L. McCormick, III, Judge

In these appeals, the common issue is whether state-agency employers implemented the decisions of two grievance panels issued pursuant to the provisions of former Code § 2.1-114.5:1.

The plaintiffs in these cases are state employees entitled to file grievances under the provisions of former Code § 2.1-114.5:1, in modified form now Code §§ 2.1-116.05 to -116.07. Following are the pertinent provisions of the statutes in effect when these issue arose:

> Definition of grievance. -- A grievance shall be a complaint or dispute by an employee relating to his employment, including but not necessarily limited to (i) disciplinary actions, including dismissals, demotions and suspensions[.]

Former Code § 2.1-114.5:1(A) (Supp. 1994).

> Management responsibilities. -- Management reserves the exclusive right to manage the affairs and operations of state government.  Accordingly, the following complaints are nongrievable: . . . (vii) the . . . transfer [and] assignment . . . of employees within the agency.

Former Code § 2.1-114.5:1(B) (Supp. 1994).

> The decision of the panel shall be final and binding and shall be consistent with provisions of law and written policy.

Former Code § 2.1-114.5:1(D)(4)(d) (Supp. 1994).

> Either party may petition the circuit court having jurisdiction in the locality in which the grievant is employed for an order requiring implementation of the panel decision.

Former Code § 2.1-114.5:1(F) (Supp. 1994).

## I.

Maurie L. Daughtry was first employed in the Norfolk district office of the Virginia Department of Taxation as a field representative, dealing in person with delinquent taxpayers. In July 1990, the Department terminated Daughtry's employment for a number of asserted reasons. A grievance panel determined that the Department proved several of these reasons, which included lying to management, disruptive behavior, arguing, and insubordination, but reversed Daughtry's dismissal and imposed a 30-day suspension. The panel also recommended that she be transferred to another office.

The Department reinstated Daughtry and transferred her to its Peninsula district office in Newport News. On March 13, 1992, Daughtry's employment was again terminated because of her alleged unsatisfactory job performance and the Department's receipt of information from the office of Daughtry's psychiatrist and another Department employee that Daughtry had threatened to kill one of her supervisors and herself if she were terminated.

Daughtry appealed that decision to a grievance panel.  The panel held a hearing on whether the Department was justified in terminating Daughtry because of the threats and her unsatisfactory job performance.  At that hearing, a witness described the Department's receipt of information about the threats, and Daughtry did not deny making them.  The grievance panel found that Daughtry's termination "was motivated in part because of the alleged immediate need to remove the employee from the premises of the Peninsula Office."

The panel "modifie[d] the termination action by the agency because of mitigating circumstances and recommend[ed] reinstatement to the same or similar position" after Daughtry was evaluated by a mental health professional who would certify that Daughtry was fit to return to the stresses and demands of her position in the Department.  The panel also recommended that Daughtry be assigned to an office other than the Peninsula office, where Dallas Parker, a supervisor with whom Daughtry had a problem, worked.

After being notified that it could not require or recommend the mental health evaluation, the panel modified its decision by (1) "order[ing Daughtry's] reinstatement to the same or similar position," (2) deleting its recommendations of an evaluation by a mental health professional and a transfer to another office, and (3) adding the following:  "The panel did not feel that the Agency was justified in termination either for threatening a

supervisor or unsatisfactory job performance."

Upon the conclusion of the Department's unsuccessful appeal of the amended panel decision, the Department reinstated Daughtry as an employee. However, the Department transferred her temporarily to its Richmond office and advised Daughtry that she could elect to be assigned permanently to that office or to any district office other than the Norfolk, Peninsula, or Bristol offices.[1] The Department also directed Daughtry to undergo a mental health evaluation to certify her "readiness for duty" prior to reporting for work on December 16, 1992. Although Daughtry reported for work, she did not provide the required certificate and she did not begin work.

Thereafter, the Department advised Daughtry that if she failed to report for work with the required certification by December 23, this would be considered as her resignation. Whereupon, Daughtry filed a petition in the circuit court to implement the panel's decision under the provisions of former Code § 2.1-114.5:1(F). She also secured a temporary injunction restraining the Department from terminating her employment pending a hearing.

---

[1]The record discloses that Richmond is the closest office to Daughtry's home in Chesapeake, other than the Norfolk and Peninsula offices where Daughtry had experienced prior disciplinary problems.

Following an _ore_ _tenus_ hearing, the chancellor held that the Department had not implemented the panel's decision and ordered it to reinstate Daughtry in "the same or similar position in its Newport News or Norfolk Office" without requiring Daughtry "to undergo a mental evaluation as a condition for reinstatement." The Department appeals.

The Department contends that since the grievance panel "did not find [that] the death threat was not made," it would have been irresponsible not to transfer Daughtry from the office in which the evidence showed that the death threats were made. Thus, the Department argues that its transfer of Daughtry to another office and its requirement of a mental health evaluation before she resumed work were "within management's prerogative [under former Code § 2.1-114.5:1(B)] and consistent with its duty to provide a safe working environment for all employees."

Daughtry contends that "the agency's attempt to block Ms. Daughtry's return to duty was in bad-faith," and that we decided this issue adversely to the Department's contention in _Zicca v. City of Hampton_, 240 Va. 468, 397 S.E.2d 882 (1990). We disagree with Daughtry.

_Zicca_ involved an employer's effort to subvert the grievance panel's decision by the subterfuge of assigning Zicca on paper to his former position, but never having him perform the duties of that position, and transferring him the following day to another position. _Id._ at 469-71, 397 S.E.2d at 882-83. Here, there was

-5-

no finding or evidence of an attempted subterfuge or bad faith; rather, the Department informed Daughtry by letter dated three weeks before she returned that she would be assigned to the Richmond office.

Further, the employer in Zicca gave no reason for Zicca's transfer; here, the record provides uncontradicted evidence of a compelling necessity to transfer Daughtry from the office in which she had made threats to kill her supervisor.  And the chancellor could not direct Daughtry's reassignment to the Norfolk office because such reassignments are the sole responsibility of the employer under the provisions of former Code § 2-114.5:1(B).  Accordingly, we conclude that the Department, in the proper exercise of its management responsibilities reserved under this code section, was justified in transferring Daughtry to its Richmond office.

Next, we consider whether the Department had the right under these circumstances to require that Daughtry obtain a mental health evaluation before returning to work, as it claims on appeal.  Daughtry successfully contended before the chancellor that the Department had no right to impose this condition upon the panel's order reinstating Daughtry, especially since it had not adopted a written policy giving it the right to require that its employees submit to mental examinations.  Again, we disagree with Daughtry.

Given the serious nature of Daughtry's threats, the evidence

of her apparently unstable mental condition, and the Department's responsibility for the safety of the supervisors and employees in the Richmond office, we think that the Department was justified in requiring Daughtry to establish her fitness to return to work. Nor, under the circumstances of this case, do we think that the Department was required to have adopted a written policy giving it such a right, as Daughtry urges.[2]  See Hill v. City of Winona, 454 N.W.2d 659, 661 (Minn. App. 1990) (employer can require employee to submit to psychological examination if unwritten policy is reasonably applied).  Accordingly, we hold that the Department was justified in requiring that Daughtry submit to and pay for a mental examination by a mental health professional of her choice prior to resuming work.

Therefore, we will reverse the final decree of the chancellor and enter a final decree dismissing the petition.

---

[2]We note that an unwritten policy does not give the Department unfettered discretion to require employees to submit to mental examinations.  If the Department unreasonably required such an examination, the employee could have refused to submit to the examination and raised the issue as a grievance if the employee was disciplined as a result of such refusal.  Former Code § 2.1-114.5:1(A)(i) (Supp. 1994).  And the employee's right to raise the issue has not been abrogated by the amendments to the grievance statute.  Code § 2.1-116.06(A)(i).

II.

James R. Dillon was employed by the Bureau of Industrial Enterprises, a division of the Virginia Department of Corrections (individually and collectively the Department), as the supervisor of the Halifax Correctional Sign Shop.  After he failed to report to work on two days for which he had requested and been denied annual leave to attend a non-job-related seminar, Dillon was terminated in March 1992 for "[f]ailure to follow supervisor's instructions, perform assigned work or otherwise comply with applicable established written policy."  Upon Dillon's appeal to a grievance panel, the panel "felt that the written notice [specifying the grounds for termination] was warranted." However, it modified Dillon's termination to a 30-day suspension without pay because of "mitigating circumstances."

During Dillon's absence from work following his first termination, the Department discovered that the monthly sales records of the Sign Shop prepared by inmate workers were inflated by $432,630 or 137.7% in late 1991 and early 1992, four months of the period in which Dillon was responsible for verifying the accuracy of these records.  Although inmate workers prepared these reports and incentive payments were made to some of the inmate workers based upon the monthly sales records, Dillon signed them without verifying their accuracy.  The reports were then sent to the Department which made substantial overpayments to some of the inmate workers as a result of these inflated

figures.

Dillon's employment was again terminated because of his "[f]ailure to adequately perform assigned work and comply with [the] applicable written pay plan for [the Sign S]hop." Dillon appealed that decision to another grievance panel. Although upholding the grounds for termination, the panel overturned the termination decision and directed that Dillon be suspended for another 30 days, again because of "mitigating circumstances."

Upon Dillon's reinstatement, he was not returned to his former position as Sign Shop Supervisor, but was assigned to the position of Building and Grounds Supervisor at the Dillwyn Correctional Center. Pursuant to former Code § 2.1-114:5:1(F), Dillon filed a petition in the circuit court for implementation of the grievance panel decisions. Concluding that the panel had no authority to reinstate Dillon except to the position from which he was discharged, the trial court held that "the result of the panel opinion in this case is reinstatement of this employee to his former position" and that the Department had not complied with the panel's decision. Accordingly, the trial court ordered the Department to reinstate Dillon to his former position as Sign Shop Supervisor.

The Department argues that the trial court erred in ordering this reinstatement because (1) neither panel ordered Dillon to be reinstated to his former or a similar position, (2) Dillon's transfer was for compelling reasons related to his job

performance, (3) former Code § 2.1-114.5:4(B) gave the Department the right to transfer Dillon to another job for which he was well-qualified at the same pay, and (4) the Department was required to hire a replacement for Dillon in his former job while his first grievance was pending. Dillon responds that (1) the grievance panel had no authority to transfer Dillon to another position, and (2) since he prevailed in both his grievance petition proceedings, this case is controlled by Zicca, which he reads as holding that "[w]hen the agency loses a discharge case, it must reinstate the person to the job that he previously held."

We agree with Dillon that the grievance panel had no authority to transfer him to another position. See Jones v. Carter, 234 Va. 621, 625-26, 363 S.E.2d 921, 924 (1988) (grievance panel does not have authority to promote aggrieved employee). And we think that if the employee is reinstated by the panel, in the absence of evidence of justification for a transfer to another position within the agency, the agency must reinstate the person to his former position.

In this case, however, the evidence demonstrated Dillon's unsatisfactory job performance in several important respects. In 1990, Dillon closed the shop for two and a half days without authorization and was suspended for 10 days for that offense. In 1992, during a telephone conversation with one of his supervisors, Dillon was told that the Department had no one who could replace him for the two days when Dillon wanted to take

-10-

leave and that the Department could not close down the shop during that time. Dillon responded that he would not come to work those two days and "you do what you have to do" and then hung up the telephone. In 1990, Dillon had been warned that his job performance was unsatisfactory because of inadequate production records in the sign shop. Yet, as noted earlier in this opinion, in 1991 and 1992, Dillon never checked the sales records kept by inmate workers and thus permitted them to substantially inflate the sales figures resulting in overpayments to some of the inmate workers.

We conclude that this evidence amply justified the Department's exercise of the management responsibilities reserved to employers under former Code § 2.1-114.5:1(B) to reassign Dillon within the Department to another position in the same pay grade. Accordingly, we will reverse the judgment of the trial court and enter a final order dismissing the petition.

Record No. 941729 – <u>Reversed and final decree</u>.
Record No. 941955 – <u>Reversed and final judgment</u>.